690 A.2d 623

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CURTIS MIDDLETON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1997—Decided March 21, 1997.

Stern and Humphreys, JJ.A.D., concurred in the judgment and filed separate opinions.

Before Judges PRESSLER, STERN and HUMPHREYS.

*Cecelia Urban,* Assistant Deputy Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney; *Ms. Urban,* of counsel and on the brief).

*Margaret Marley,* Assistant Prosecutor, argued the cause for respondent (*Carmen Messano,* Hudson County Prosecutor, attorney; *Ms. Marley,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Following a trial by jury, defendant Curtis Middleton was convicted of two counts of distributing drugs within 1,000 feet of school property, *N.J.S.A.* 2C:35-7. Convictions of lesser-related drug offenses were merged into the school-zone convictions, on which defendant was sentenced to concurrent prison terms of nine years subject to a four-year parole ineligibility term. Defendant appeals, and we reverse and remand for a new trial. In sum, we agree with defendant's assertions on appeal that the trial judge inadequately responded to a jury question regarding the State's

identification evidence, that the judge gave an inadequate identification charge, and that the errors made by the State prior to trial regarding the date and time of the alleged crimes deprived him of a fair opportunity to prepare and present an alibi defense.

The facts underlying the State's charges against defendant are as follows: the Jersey City police undertook an investigation in response to complaints of drug trafficking at the Currys Woods housing project. On the night in question a police team set up an undercover buy operation, intending, however, not to make any immediate arrests in order to protect the identity of the undercover officer during the course of the ongoing investigation. Participating in that operation, among others, were Sergeant Costigan and Officer Sullivan of the Jersey City police and Investigator Carlos Aguiar, a Union City police officer on assignment to the Hudson County Prosecutor's office. Investigator Aguiar was to attempt to make the buy. Officer Sullivan was secreted in a neighboring backyard, using binoculars to observe the proceedings. Sergeant Costigan was in a vehicle. Aguiar approached the west patio of one of the buildings in the project on a bicycle. Two men were standing there.

According to Aguiar's testimony, the transaction occurred at 12:30 a.m. on Saturday, July 23, 1994. He approached the two men on the patio. One of them asked him if he wanted "coke or dope," which Aguiar understood to mean cocaine or heroin. He replied that he wanted both, and the man took from his pocket a small vial, which later proved to contain cocaine, and a small packet, which later proved to contain heroin. Aguiar gave him a twenty-dollar bill, the man handed Aguiar the drugs, and Aguiar rode away. The seller also left the area. Sullivan, who testified that he was about one hundred feet away and observed the transaction, then radioed Costigan, who was to make the identification. The seller, however, apparently eluded Costigan. Costigan did not testify. At this point, all the police knew of the seller's identity was Aguiar's description, which included, as the man's most distinctive feature, a hairstyle described by Aguiar as

shaven to about two or three inches above the ears and topped by a "small Afro."

Three days later, Sullivan testified, while he was again a surveillant in the same area but watching other transactions by other persons, he fortuitously recognized Aguiar's seller. Sullivan was able to ascertain the name of that person, obtained his photograph, apparently a mug shot, and showed it to Aguiar. Aguiar identified the person as the man from whom he had purchased the drugs three days earlier. The mug shot was a picture of defendant. Complaints were filed against him, and the grand jury ultimately returned a ten-count indictment charging five separate crimes related to the sale of the cocaine, less than one-half ounce, and five parallel, separate crimes relating to the sale of the heroin, also less than one-half ounce.

The indictment.alleged that the crimes had occurred on or about July 26, 1994. Aguiar, apparently the sole witness at the grand jury hearing, there testified that the transaction had taken place on July 26, 1994, at 12:30 p.m. The police report indicated at the top that the transaction had taken place on July 23 but at the bottom, the date specified was July 26. The complaints alleged the transaction to have taken place on July 23, 1994, and were also sworn and subscribed to on that date, although it is clear that defendant's identity was not known to the police until July 26. Finally, the police report's indication of the 12:30 hour of the transaction was also confused. Although not introduced into evidence or included in the appendices, Aguiar described the report thus: "On the bottom it's a.m. On the top it's p.m. That's on the bottom." It appears, however, that the a.m. specification was inferred on the basis of military time, the time designated being simply 12:30, which translated to standard time, however, would be 12:30 p.m.[1]

---

[1] The witness's confusion in this regard was based on his misapprehension that noon in military time is 2400 hours.

The case was called for trial on Tuesday, September 12, 1995. Midway through jury selection, the State moved for leave to amend the indictment to change the date of the crimes from July 26, 1994, to July 23, 1994. Defense counsel objected, but only in general terms. The amendment was allowed. When jury selection had been completed but the jury not yet sworn, defense counsel again objected to the amendment, explaining that defendant had advised her that he had alibi witnesses for July 23, although he had none for July 26, and that, in fact, all the investigation done by her office had been in terms of July 26. The prosecutor argued that defendant should have realized that any references to July 26 in the police reports, the grand jury testimony, and the indictment were erroneous since July 23 had been specified as the date of the crime in the complaints as well as in other portions of the police report. In any event, the judge refused to reconsider his ruling permitting the amendment of the indictment, finding no prejudice to the defendant.

Trial resumed the next morning, Wednesday. Defense counsel immediately moved for relief, explaining to the judge that defendant told her that at 12:30 p.m. on July 23, 1994, a Saturday, he had been with many members of his family and family friends preparing an outdoor birthday party for a young niece. She asked, at the very least, for a continuance of the trial until the following Monday so that she could investigate defendant's assertion. The prosecutor joined in that application, taking the position that if the alibi were to be asserted so late, she too needed an opportunity to investigate the alibi witnesses. As far as we understand the record, the judge, fully appreciating the obvious problems of both sides, agreed that the requested continuance would be appropriate. The judge, however, said that as "it's not my case," he would have to talk to the presiding judge. He took a recess for that purpose, and when he resumed the bench, advised that "the presiding judge has suggested ... [that defense counsel] reach out for your witnesses now." A colloquy ensued in which defense counsel argued the necessity of an opportunity to interview the potential witnesses, of whom there appeared to be eight,

in order to make an informed decision as to which, if any, she should call in support of the alibi defense. The judge responded as follows:

> Well, you may have to make a determination based upon availability ... rather than quality. Alright? Because ... this case is going to go forward.

He assured counsel, however, that when her investigator, assisted by defendant himself, managed to assemble all the witnesses in the courtroom—an event he hoped would take place by noon that day—"we will take an appropriate break for you to talk to them and ... [the prosecutor] to talk to them." At that point, the jury was finally sworn, preliminary instructions given, and counsel opened. Understandably, defense counsel made no reference to the still uninvestigated and unascertained alibi defense, which both defendant and the defense investigator were then trying to establish.

While those efforts were being made, the State called its first witness, Investigator Aguiar. He testified, on extensive direct and cross examination on the point, that the transaction had taken place not on Saturday, July 23, at 12:30 p.m., as by that time both defendant and the court had assumed to be the fact, but rather just after midnight, namely on Saturday morning at 12:30 a.m. He further asserted that any mistake in the date or time was simply due to typographical error. Upon the conclusion of Aguiar's testimony, defense counsel advised the judge that in an effort to comply with the court's earlier directives, she was able to obtain the presence in the courtroom of defendant's mother, his three sisters, and his brother in support of the 12:30 p.m. alibi. She then asserted that:

> [E]very time I get this narrowed down at all, the date or date—the time or date changes. And I don't see how I can be expected to pull together a defense and mount a defense for my client when nobody seems to know when or where this incident happened or what the date and time that this incident occurred.

Defense counsel then made clear to the judge that she had been, in the time allotted, barely able to work on the 12:30 p.m. alibi, and had never even talked to her client about his whereabouts at 12:30 a.m. It appears from the record that defendant then spoke

to defense counsel and she reported to the court that defendant claimed indeed to have an alibi for 12:30 a.m.—he had been to a party in a bar in New York with his brother and a group of friends. Again she complained to the court about her then "untenable position," exacerbated by the then unavailability of her investigator, who had been assigned to another matter taking him out of the county. The judge was sympathetic, recognizing that errors in the investigation reports, compounded by the prosecutor who had presented the matter to the grand jury, had "fouled up" the case. He therefore promised defense counsel "every latitude," except a continuance, because "we're going to continue." Officer Sullivan's testimony then completed the trial day.

The next morning, Thursday, defense counsel advised the court that she had been unable since the prior afternoon to contact two of the people defendant claimed to have been with him in New York at 12:30 a.m. that Saturday morning, but that defendant and his brother had found two others who were there, Brian Coleman and Andrew Wright. Although she had not had an opportunity to speak with either, she was expecting them in court. The State rested. It was reported by defense counsel that Coleman did not come since he had a pressing prior engagement with a recording studio. Wright did apparently come, but defense counsel decided not to put him on the stand. In the event, only defendant's brother testified on his behalf, and his credibility was vulnerable because of his prior convictions. Defendant did not testify.

The judge did not give the jury a special identification instruction prescribed by *State v. Green*, 86 *N.J.* 281, 430 *A*.2d 914 (1981). During its deliberations, the jury sent this question to the judge: "Can we see the testimony of officers Sullivan and Aguiar regarding the identification of the Defendant?" The trial had been sound recorded. There was no transcript. The judge did not make any further inquiry of the jury to determine if what they were asking for was, in effect, a read-back. He answered the

question with one word—"no"—and sent the jury back to deliberate.

We have belabored the relevant substantive and procedural facts because we are convinced that their mere recitation suffices to demonstrate the prejudicial errors infecting this trial. To begin with, proof of defendant's guilt of the crime depended exclusively on the officers' identification testimony. Defendant had been previously unknown to either of them. One of them observed the transaction at night, from 100 feet away, through binoculars. The hairstyle description was hardly conclusive because defendant did not have the described shaved head with a small Afro on top, but rather a shaved head with "corn-rows"—that is, small braids—on top. There was no fact in evidence other than the identification testimony connecting defendant with the sale. Identification was what this case was fundamentally all about.

The issue obviously concerned the jury as well, as evidenced by its question. In the circumstances, we are persuaded that the judge was obliged to do more than simply answer its question in the negative. It is well settled that the trial court must respond substantively to questions asked by the jury during deliberations and must assure itself that it understands the import of the questions. *State v. Graham*, 285 *N.J.Super.* 337, 342, 666 *A.*2d 1372 (App.Div.1995); *State v. Parsons*, 270 *N.J.Super.* 213, 221, 636 *A.*2d 1077 (App.Div.1994). We think it plain that this jury, at the least, wanted to review the testimony it had asked to see. That could have been ascertained by the judge and should have been. And if that was the import of the jury's question—and indeed we can hypothesize no other—the jury should have been accommodated.

We understand that these proceedings were sound recorded and hence that the judge's answer that the jury could not *see* the testimony was literally correct. But the same would have been so had the proceedings been transcribed by a stenographic reporter. In that instance, the jury also cannot *see* the testimony. In both cases, however, they can hear it. There can be no doubt

that ordinarily a judge should accede to a jury's request to have testimony read back to it. *See, e.g., State v. Wilkerson,* 60 *N.J.* 452, 460, 291 *A.*2d 8 (1972); *State v. Rodriguez,* 234 *N.J.Super.* 298, 311, 560 *A.*2d 1233 (App.Div.), *certif. denied,* 117 *N.J.* 656, 569 *A.*2d 1350, 1351 (1989); *State v. Richardson,* 208 *N.J.Super.* 399, 406, 506 *A.*2d 43 (App.Div.), *certif. denied,* 105 *N.J.* 552, 523 *A.*2d 188 (1986). We do not see that any different rule should obtain where the proceedings are sound recorded rather than stenographically transcribed.

We understand that the sound recording equipment used in the courtroom includes counter devices and that logs are required to be kept. Mechanically, therefore, there is no reason, if there is a good log, why a playback of the required testimony cannot be arranged. Indeed, the New Jersey Supreme Court Committee on Court Reporting anticipated the need for playback on sound equipment and was entirely confident of its amenability to that application. Thus, the Committee's Final Report noted that:

> There was also evidence that stenographic reporting more easily accommodates readbacks required by lawyers. The Committee recognizes that it may be easier to find specific testimony by scanning stenographic notes than it is to find specific testimony by rewinding and fast forwarding a sound or videotape recorder. However, if a good log of the proceedings is kept, readbacks (*i.e.* playbacks) can be readily done from an electronic recording tape. Moreover, once the material to be played back is found on the tape, the playback is superior to an OCR readback as long as the courtroom is equipped with speakers for playback, a Committee recommendation. Sound recording playbacks are also aided if the court employs a remote digital counter on the bench.
> [Final Report (1991) at 38.]

We recognize that it may take a bit longer for the operator of sound equipment to find precisely what the jury wants on the tape than it would take a stenographic reporter. But even if that is so, it would hardly constitute an adequate reason for depriving the jury and the parties of the "readback," which a trained operator can provide. Moreover, in this case, further questioning by the judge surely would have helped to isolate the specific area of the jury's concern and the particular question it had on the testimony it wanted to hear again. In our view, the one option the judge did not have was to simply ignore the jury's request, and that is

essentially what the judge did here. Nor, in view of the critical nature of the identification testimony, can we regard that lapse as harmless error.

We are equally concerned about the identification instruction to which defendant did not, however, object at trial and which therefore must be evaluated under the plain error standard. As we have noted, the primary issue in the case was whether defendant was in fact the person who had sold drugs to Aguiar during the early morning of July 23, 1994. The State's proofs consisted exclusively of the identification testimony of the officers. It is well settled that when identification is the crucial issue in the case, the defendant is entitled to a discrete and specific instruction, providing "appropriate guidelines" and "focusing the jury's attention on how to analyze and consider the factual issues with regard to the trustworthiness of [the eyewitness's] in-court identification." *Green, supra,* 86 *N.J.* at 292, 430 *A.*2d 914. Following *Green,* the Committee on Model Charges—Criminal developed an extensive identification charge prefaced by this note:

> Whether or not a separate charge on the subject of identification is necessary depends upon the situation presented in an individual case. The Committee recognizes that in a simple case the issue may be submitted to the jury wholly within the framework of a charge on credibility generally. However, where the issues presented are multi-faceted and somewhat complex consideration should be given to an in-depth charge. The Committee is of the view that a model charge fit for universal application is impossible of formulation. The following suggested charge is intended as a tool and should not be delivered without some forethought.
>
> [Model Jury Charge—Criminal–Non–2C Charges, Section II. Identification (approved 11/26/90).]

We have no doubt that defendant was entitled to a specific identification charge. Instead, the judge gave the model jury charge that advises the jury that if defendant's presence at the scene of the crime is essential to proving his guilt, the State has the burden of proving his presence beyond a reasonable doubt. That charge was inadequate properly to focus the jury's attention. Because, however, we are satisfied that the totality of errors here requires reversal of defendant's conviction, we need not determine whether the error in the charge by itself would have required

reversal, except to note that errors in the charge are "almost invariably regarded" as "poor candidates for rehabilitation under the harmless error philosophy." *State v. Vick,* 117 *N.J.* 288, 289, 566 *A.*2d 531 (1989). *And compare State v. Frey,* 194 *N.J.Super.* 326, 328–330, 476 *A.*2d 884 (App.Div.1984) (plain error found in failure to give identification charge where there was no corroborating evidence other than the victim's identification) with *State v. Salaam,* 225 *N.J.Super.* 66, 69–72, 541 *A.*2d 1075 (App.Div.1988) (plain error not found in failure to give identification charge where the victim had full closeup opportunity to make an identification of the assailant and there was other corroborating evidence of his guilt).

We come now to the problem of the amendment of the indictment, the confusion over the time of the crime, the denial of the motion for a continuance, and the affect of all these circumstances on defendant's attempt to prove an alibi defense. We recognize the importance to the administration of criminal justice, both in defendants' interests and in the interest of the justice system, of speedy trials and the consequent need for credibility of calendaring. Nevertheless, while justice delayed may be justice denied, there are circumstances in which premature justice denies justice as well.

 To begin with, we are satisfied in the circumstances here that the State's motion to amend the indictment should not have been granted without an attendant continuance of the trial having also been ordered. *R.* 3:7–4 provides that:

> The court may amend the indictment or accusation to correct an error in form or the description of the crime intended to be charged or to charge a lesser included offense provided that the amendment does not charge another or different offense from that alleged and the defendant will not be prejudiced thereby in his or her defense on the merits. Such amendment may be made on such terms as to postponing the trial, to be had before the same or another jury, as the interest of justice requires.

Both the letter and the spirit of the rule were violated here. It is clear that the amendment did not charge another or a different offense. *See, e.g., State v. Graham,* 223 *N.J.Super.* 571, 577, 539

*A*.2d 322 (App.Div.1988). We are also aware that the State is ordinarily given leave to amend the date alleged in the indictment where the date is neither of the essence of the offense nor crucial either to the State's case or the defendant's, and defendant is not, therefore, prejudiced. *See, e.g., State v. Stefanelli,* 78 *N.J.* 418, 429, 396 *A*.2d 1105 (1979); *State v. Bowens,* 219 *N.J.Super.* 290, 294, 530 *A*.2d 338 (App.Div.1987); *State v. Kuske,* 109 *N.J.Super.* 575, 583–586, 264 *A*.2d 227 (App.Div.1970). *See also State v. Holder,* 137 *N.J.Super.* 300, 305, 349 *A*.2d 68 (App.Div.1975), *certif. denied,* 69 *N.J.* 443, 354 *A*.2d 640 (1976). There was, however, obvious prejudice here. Thus, while the date alleged in the indictment was not of the essence of the crime, it was the essence of the defense since defendant claimed to have an alibi for the amended date.

■ It is fundamental that a defendant may not be deprived of a defense or the opportunity to prepare and present one by reason of the State's late amendment of the indictment. *See, e.g., Bowens, supra.* Here, a mere three-day continuance was requested to enable defense counsel to investigate defendant's alibi claim, and the prosecutor joined in that request. It was a mistaken exercise of discretion for the motion to have been denied. The jury had not yet been sworn. No possible question of double jeopardy could have been raised. Because the judge demanded that the alibi be investigated after trial commenced, defense counsel was unable to refer to the alibi in her opening—a matter of not inconsiderable prejudice. Defendant himself was instructed to assist the investigator during trial, necessarily distracting him from what should have been the sole focus of his attention—what was going on in the courtroom. And, obviously, defense counsel's ability to present proofs in support of that alibi was drastically compromised.

The burdens placed on the defense were then grievously exacerbated when the State's first witness testified to a time of the crime completely contrary to the time for which, to the prior knowledge of the court and the prosecutor, the defendant, defense counsel,

and defense investigator were all scurrying around during trial attempting to establish the alibi. At that point, and in view of defendant's assertion that he could also establish an alibi for the "new" time, the interests of justice demanded that he be afforded a reasonable opportunity to do so. That opportunity was not afforded. The interests at stake are too significant to require a defendant accused of serious crime to prove his defense on the fly while the State keeps changing the ground rules. Consequently, a continuance or even the declaration of a mistrial with defendant's consent was then appropriate.

Since defendant must be retried, we do not address his challenge to the sentence imposed.

Reversed and remanded for a new trial.

STERN, J.A.D. (concurring).

I concur in the reversal of defendant's conviction.

Based on the aggregate of facts detailed in Judge Pressler's opinion, I conclude that defendant did not receive a fair trial. Accordingly, I need not address whether any single ground raised by defendant itself necessitates a reversal. Suffice it to quote what Justice Jacobs stated so well for our Supreme Court over forty years ago:

> The sound administration of criminal justice in our democracy requires that both the end and the means be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries. This, of course, does not mean that the incidental legal errors, which creep into the trial but do not prejudice the rights of the accused or make the proceedings unfair, may be invoked to upset an otherwise valid conviction; under these circumstances it would be grossly unjust to the State and its people to grant a new trial.... Where, however, the legal errors are of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair, our fundamental constitutional concepts dictate the granting of a new trial before an impartial jury.
>
> [*State v. Orecchio*, 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954) (citations omitted).]

Accordingly, I concur in the judgment.

HUMPHREYS, J.A.D. (concurring).

I respectfully disagree with much of Judge Pressler's analysis of the record and with her criticism of the trial judge's discretionary decisions permitting the amendment of the indictment, denying a three day continuance and failing to declare a mistrial.

Because I concur in the reversal, it would serve no useful purpose to set forth my disagreement at length. Suffice it to say, my reading of the record satisfies me that the defendant was not prejudiced by the above decisions of the trial court, and that the trial judge exercised his discretion on these matters with due consideration for the defendant's right to a fair trial. Accordingly, I would sustain the trial judge's finding that the "defense [was given] adequate time to restructure its alibi defense and to contact the appropriate witnesses."

We should be mindful that the public also has rights including the right to expect that a criminal trial will be conducted efficiently and effectively without being encumbered by unnecessary delays and mistrials. Delay is an ancient enemy of justice. *See Magna Charta* art. 40 ("[t]o none will we deny, or delay, right or justice."). Unnecessary continuances and retrials mean that the trials of other criminal cases must be held in abeyance. The resources available to the criminal justice system are quite limited. In the absence of real prejudice to a defendant's rights, continuances should not be readily granted.

Further, a mistrial here would have been completely unwarranted. Once started, trials should proceed to conclusion. *State v. Rechtschaffer,* 70 *N.J.* 395, 406, 360 *A.*2d 362 (1976). Mistrials are generally granted only to prevent manifest injustice. *Ibid.; see also N.J.S.A.* 2C:1–9(d)(3); *Gori v. United States,* 367 *U.S.* 364, 368, 81 *S.Ct.* 1523, 1526, 6 *L.Ed.*2d 901, 904 (1961).

Nevertheless, I concur in the reversal because the judge's refusal, without explanation or inquiry, to accede to the jury's request for the identification testimony was clearly capable of causing a miscarriage of justice. *See R.* 1:7–5; *State v. Wilkerson,*

60 *N.J.* 452, 460, 291 *A.*2d 8 (1972) ("Normally a trial court, which has ultimate discretion in the matter, should readily accede to any request by a jury to have any particular testimony read to it during its deliberations."); *State v. Wolf,* 44 *N.J.* 176, 185, 207 *A.*2d 670 (1965) (the jury's request for reading of testimony should be granted in the absence of some unusual circumstance because "[t]he true administration of justice calls for such action").

This case turned on identification. The jury wished to have its memory refreshed on the identification testimony of the State's witnesses. The judge's refusal coupled with his failure to give the model identification charge had a clear potential for causing an unjust result. *State v. Green,* 86 *N.J.* 281, 291, 430 *A.*2d 914 (1981) (the potential danger of mistaken eyewitness identification is particularly significant where identification is "a fundamental and essential trial issue"). When a jury is not given proper guidance on an issue critical to guilt or innocence, a conviction must be reversed.