# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1795-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

D.C.-M.,[1]

     Defendant-Appellant.

_____

Submitted September 19, 2024 – Decided October 15, 2024

Before Judges Mawla, Natali and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 16-02-0347.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel Marzarella, Chief

---

[1] We use initials or fictitious names for the defendant, the victim, and certain witnesses to protect the victim's privacy interests. N.J.S.A. 2A:82-46(a); R. 1:38-3(c)(9).

Appellate Attorney, of counsel; Shiraz Deen, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant D.C.-M appeals from a Law Division order denying him post-conviction relief (PCR) without an evidentiary hearing. Having reviewed the record and considered the applicable legal principles and standards, we affirm.

I.

Defendant was tried before a jury and found guilty of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2A; second-degree sexual assault, N.J.S.A. 2C:14-2B; and second-degree endangering the welfare of a child N.J.S.A. 2C:24-4A(1). He was later sentenced to a thirty-year aggregate term. We affirmed defendant's conviction and sentence on direct appeal, remanding only for the court to make the necessary factual findings and, if necessary, conduct an ability to pay hearing with respect to the assessed penalties. See State v. D.C.-M, No. A-1142-17 (App. Div. Jan. 30, 2020), certif. denied, 241 N.J. 382 (2022).

The relevant procedural history and trial evidence supporting defendant's convictions are detailed in our unpublished opinion and in the PCR judge's comprehensive seventeen-page written decision. We incorporate both by reference here and restate the relevant facts and history for ease of reference.

On June 19, 2015, at approximately 7:00 a.m., the Lakewood Police Department received a 9-1-1 call regarding a sexual assault at a local residence. Detective Melissa Matthews of the Ocean County Prosecutor's Office responded to the home to investigate and learned that the victim was an eight-year-old girl, Y.S.M. (Yvette). Matthews interviewed Yvette's mother, C.M.T. (Claudia), and Yvette's cousin, A.S.C. (Anne). Yvette and Claudia lived in a home with Claudia's two sons, Yvette's brothers, and her boyfriend, defendant. Defendant is not the biological father of the children. Anne lived with her child, husband, and mother-in-law in an adjoining apartment.

Anne, who placed the 9-1-1 call, testified that she "heard some noise" that morning in Claudia's part of the residence. Specifically, she recalled hearing Yvette saying "no" three times. Anne feared that Yvette was "going through something horrible," had a "bad premonition," and was concerned someone was "forcing" Yvette to do something against her will. Anne opened the door connecting the residences and testified she witnessed defendant on a couch with a blue blanket on his lap and Yvette down "on her knees" with her mouth "on his penis." Anne further testified that defendant looked directly at her and then ran into the bathroom with his erect penis exposed.

Despite witnessing the assault, Anne did not enter the home to remove Yvette. Instead, she testified she woke her husband and instructed him to call the police while she went to alert her mother-in-law. Anne's husband then removed Yvette and brought her to their apartment.

Yvette "was shaking" and repeated that she "didn't do anything." Anne testified she asked Yvette if this happened before and Yvette responded that it happened "many times" including in the home where Yvette and her family, including defendant, lived approximately a year and a half earlier. Anne stated Yvette specifically told her that in the past defendant forced her to touch his penis, he touched her vagina, kissed her, and further assaulted her by performing oral sex on her. Yvette also told Anne that defendant tried to vaginally penetrate her.

Claudia testified that defendant woke her on June 19, 2015, and stated Anne "was crying and that she had taken Yvette to her room." Claudia went downstairs and observed that her two sons were still sleeping. Claudia heard Anne crying and testified that she "could hardly speak." Anne eventually told Claudia that she saw Yvette "doing oral sex" to defendant while on the couch. Claudia testified that she was shocked and could not believe defendant would abuse Yvette. Claudia began to cry and asked Yvette if defendant had "put his

4

penis in her vagina." Yvette also told Claudia about defendant's sexual abuse and assaults.

Donna Velardi, a forensic nurse with the Ocean County Prosecutor's Office, performed a sexual assault evaluation and testified that she did not see any injuries on Yvette's body, but did detect unspecified cloth fibers on Yvette's skin. She collected multiple swabs including in the area around Yvette's outer lips. Cortney MacDonald, a New Jersey State Police forensic scientist, analyzed the evidence and testified she did not detect sperm on the collected swabs.

Matthews also interviewed Anne, Claudia, and one of Yvette's brothers. The recorded interview with Yvette was played for the jury. In that interview, which was largely consistent with her trial testimony, Yvette stated defendant abused her in multiple locations, including on his bedroom floor, and that the abuse started in their prior residence. In one incident, Yvette told Matthews that defendant placed his finger in her vagina. Yvette further testified at trial that, on "more [than two] times," defendant's "mouth went into [her] private part," and that he would "put his mouth on [her] chest . . . and [her] mouth." Yvette also told Matthews that in the morning of June 19, 2015, defendant forced her to perform oral sex while she was getting ready for school.

5

However, Yvette stated during the interview, and at trial, the incident occurred in a closet under the stairs, not on the couch, and specifically denied being abused on the couch that morning. Further, Yvette did not corroborate Anne's statement that defendant ran into the bathroom with a blanket and stated she did not have a blue blanket concealing her head, again contrary to Anne's testimony. Yvette also testified that Anne told her she witnessed defendant putting his penis in her mouth.

After the interviews, Officer Donald Fazio and another officer returned to Claudia's home to inspect the closet where Yvette stated the abuse took place that morning and collected swabs, including of what he thought was "a liquid or a fluid" on a wall. Fazio stated that he collected the swabs taken by Velardi and a purple tank-top belonging to Yvette that was found on the top of the arm of the couch where Anne allegedly witnessed the assault. Although the swabs did not detect sperm or saliva, MacDonald testified that Yvette's DNA was on the tank-top and there was a "fairly high" chance that defendant's DNA was also on it.

MacDonald explained that since she initially detected only Yvette's DNA on the tank-top, she performed additional YSTR testing that "hones in on the Y chromosome which only males have." She confirmed that a "mixed YSTR DNA

profile was obtained [from the tank-top]" that matched the YSTR DNA profile from a specimen provided by defendant. She determined, however, that "all of [defendant's] paternal male relatives cannot be excluded" due to the paternal inheritance characteristic of the DNA test performed. No other males related to defendant lived in the residence.

Defendant also testified at trial and specifically denied Yvette's and Anne's allegations and that he ever touched Yvette inappropriately. He stated that both Yvette and one of her brothers were awake when he was downstairs and that he was simply sitting on the couch when Anne opened and closed the door and asked Yvette to come to her apartment. He further testified that "[his] penis never went out of [his] pants."

He also stated that he went into the bathroom to brush his teeth and did not even see Anne. Defendant acknowledged, however, that Anne, her husband, and her mother-in-law were in his apartment when he left the bathroom, and Anne "was crying" and holding Yvette "by her arm." Defendant also stated no one would tell him what was happening, but that Yvette refused to leave with Anne until he promised to get Claudia.

Defendant cooperated with the investigation and was interviewed on two separate occasions during which he allegedly made inculpatory statements.

A-1795-22

Those interviews were videotaped and transcribed and were the subject of defendant's unsuccessful application to suppress prior to trial. Defendant's statements in the second interview were raised by the State during the following colloquy of defendant's cross-examination when he expressly denied he told the police Yvette may have accidentally touched his penis on June 19, 2015:

> Q: Sir, is it your testimony that none of your body parts touched a body part of [Yvette] that morning?
>
> A: When we were hugging, I touched her.
>
> Q: So if on a prior occasion you stated that one of your body parts brushed up past her, that would be untrue?
>
> A: To me to brush and to touch are not the same thing. And I had said that toward the end of one of the statements I gave because the detective was pressuring me so much. And I was talking about my arm. I have never mentioned that my penis was out or that I had touched her sexually. I had never said that.
>
> Q: So if on a prior occasion you said that it was your penis that brushed up past her, that would be incorrect?
>
> A: I have never said that my penis touched her.

At that point, the prosecutor confronted defendant with the translated transcript of his statement to police and asked him:

> Q: Start on the bottom of [p]age [twenty-six], do you see that question that you're asked? And on the top of [p]age [twenty-seven], in reference to your penis, you say, no, when she jumped, when she jumped, I did this,

8 A-1795-22

right, that's when she grabbed it. But, but it was not like she wanted to grab it like this, that she wanted to grab it, it just got out of there and she grabbed it and did like this, that was all. Do you agree with me that's what that says?

A: This is what it says here, but if you see in the video, you saw that what I was explaining to her is about my arm. I was showing my arm and I was explaining to her about my arm.

Q: So when she asked you the question about your penis and your response is no, no, she touched it like this, you were not listening to her questions; is that your testimony?

A: No, my answer was never in reference to my penis. I was showing her, I asked her if I could show her what I did while I was standing near the window. But in the video, if you can see the video, you can see that I was referring to my arm because I was motioning to her my arm. Where I was standing next to the window to the place where [Yvette] was standing, there is about two and a half feet away distance.

Q: And, sir, let's talk about the window, you were saying when you were standing by the window, you were talking about the fact that [Yvette] brushed past your arm; is that what your testimony is?

A: She was there right next to the stairs, I don't know what she was looking for right there. So when I realized that she was there, I had moved my arm, I really needed to go to the bathroom and then I saw that she — so that's when I said that perhaps it was my arm that brushed against her, but I never said that I —

A-1795-22

Q: So, sir, in the statement when you say you had your penis out of your pants because you had to go to the bathroom really bad —

A: I never said that my penis was outside my pants.

. . . .

Q: And so your testimony and what you're saying to her is that you had to go to the bathroom right there, you were dancing, that you had your hand holding on to your penis so you didn't pee; is that your testimony?

A: Yes.

Q: And you go on [p]age [twenty-six], the middle of [p]age [twenty-six] to say I was dancing with my hand inside; correct?

A: Yes.

Q: And then you were asked the question "and you allow her to put her mouth in your penis." And your response is, "no, when she jumped, when she jumped, I did this, right, that's when she grabbed it. But it was not like she wanted to grab it like this, that she wanted to grab it, it just got out of there and she grab it and did like this, that was all." That's on the top of page [twenty-seven]; correct?

A: No, the answer was no and then I explained to the detective what had happened.

On redirect examination, defendant's trial counsel followed up on the aforementioned testimony, as follows:

10

Q: The prosecutor asked you questions about a prior statement that you gave about your penis being outside your pants; correct?

A: My penis never went out of my pants.

Q: Okay. So you're saying that that's an incorrect translation of what you had said?

A: At all times it was the detective that was mentioning my penis out of my pants. Never did I say that my penis was outside.

During deliberations, the jury submitted a note which stated: "Judge, at this time we cannot reach a consensus. We are at a bit of a stalemate and I do not know how to help our verdict move forward, [p]lease advise." The note also alerted the court that "[s]ome jurors are having trouble accepting 'any testimony' as proof without any physical evidence."

After conferring with counsel, the court gave the following response consistent with Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 2013):

> First let me say that it's your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors. In the course [of] your deliberations, do not hesitate to re-examine your own view and change your opinion if convinced it is erroneous, but do not

11

surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans, you are judges, judges of the facts.

Now, with respect specifically to your reference to testimony and physical evidence, I want to refer you to the copy of the charge that you have in the jury room, okay.

The foreperson responded that "[s]ince I wrote that, we've reviewed that twice and I think we've settled that issue . . . ." The court instructed them not to say anything more. The court then referred the jury to the Model Criminal Jury Charges it had previously given, including regarding reasonable doubt; direct and circumstantial evidence; and witness credibility. See Model Jury Charges (Criminal), "Reasonable Doubt" (rev. Feb. 1997); Model Jury Charges (Criminal), "Circumstantial Evidence" (rev. Jan. 1993); and Model Jury Charges (Criminal), "General Information as to Credibility of Witnesses" (rev. May 2014). The jury subsequently reached a unanimous verdict, and as noted, convicted defendant of first-degree aggravated sexual assault, second-degree sexual assault, and second-degree endangering the welfare of a child.

Defendant thereafter filed a timely pro se PCR petition in which he stated although he had lost his paperwork during his transfer between correctional facilities, he "still remember[ed] some of the points [he] was working on, like

12

contradiction between witnes[ses] and victim, and false or wrong information from the [first] [d]octor who check the victim . . . ."  His appointed counsel later amended the petition and claimed defendant's trial counsel was ineffective for failing to:  (1) recall Detective Matthews as a defense witness, "who would have testified that she lied and fabricated evidence during [defendant]'s second custodial interrogation;" (2) present the video of defendant's statement to the jury; (3) request, upon the jury's note regarding a "stalemate," the jury "be voir dired and recharged with tailored jury instructions on direct and circumstantial evidence, credibility of witnesses and reasonable doubt;" and (4) raise, during defendant's motion to suppress his statements, the alleged fabrication of DNA reports claiming defendant's DNA was recovered from Yvette's mouth.  He also contended the cumulative effect of the errors constituted ineffectiveness, and his appellate counsel was ineffective for failing to raise the jury instruction issue as plain error on direct appeal.[2]

---

[2]  Defendant does not reprise any of his pro se arguments, his cumulative error argument or his contention related to the alleged suppression and fabrication of the DNA reports.  We therefore consider each waived and accordingly do not discuss the court's decision on those points.  See State v. Zingis, 471 N.J. Super. 590, 599 n. 4 (App. Div. 2022), aff'd in part and rev'd in part on other grounds, ___ N.J. ___ (2024) (noting "[a]n issue not briefed is deemed waived" (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2022))).

After considering the parties' submissions and oral arguments, the court issued an order denying defendant's PCR petition and explained its decision in a written statement of reasons. With respect to trial counsel's failure to recall Detective Matthews, the court concluded defendant failed to prove he was prejudiced as required by the second prong of Strickland v. Washington, 466 U.S. 668 (1984). Specifically, it found Detective Matthews testified during the State's case-in-chief, and trial counsel "had the opportunity to cross[-]examine the Detective" and in fact did so. The court also found no basis to disturb defendant's conviction based on counsel's failure to introduce defendant's videotaped interview because playing the video of defendant's statement would have resulted in "great prejudice" to him.

As to the court's response to the jury's question, it found defendant's argument "purely speculative." The court highlighted the Model Jury Charges it had given and reasoned "[t]he jury's very question about a lack of physical evidence highlights their understanding of the final charge in that they were able to convict based on the testimonial evidence alone." It found "[t]he jury understood their role as jurors and understood the [M]odel [J]ury [C]harges given to them by the court." The court rejected defendant's contention that appellate counsel was ineffective for failing to raise that argument, finding he

failed to prove either <u>Strickland</u> prong on that point. The court also concluded

defendant was not entitled to an evidentiary hearing because he did not establish

a prima facie case of ineffective assistance of counsel, nor did he allege "failures

that lie outside the record that would require an evidentiary hearing."

This appeal followed in which defendant raises the following points:

> I. AS DEFENDANT HAD PRESENTED A PRIMA FACIE CASE THAT TRIAL COUNSEL WAS INEFFECTIVE AND THERE WAS A GENUINE ISSUE OF MATERIAL FACT IN DISPUTE, THE PCR COURT ERRED WHEN IT DENIED THE CLAIM WITHOUT FIRST HOLDING AN EVIDENTIARY HEARING.
>
> A. DEFENDANT SHOWED THAT TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO RECALL DET. MATTHEWS TO TESTIFY AFTER THE PROSECUTOR'S DAMAGING CROSS-EXAMINATION OF THE DEFENDANT.
>
> B. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REQUEST AN INSTRUCTION ON HOW THE JURY WAS TO CONSIDER THE EVIDENCE, WHEN THE JURY REPORTED A STALEMATE AND QUESTIONED THE LACK OF PHYSICAL EVIDENCE; DEFENDANT WAS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.

15

Having considered defendant's contentions in light of the record and the applicable law, we discern no legal or factual error in the judge's consideration of the issues, or in her decision to deny the petition without an evidentiary hearing.

## II.

Because defendant's PCR petition is predicated on his claim that his trial and appellate counsel were ineffective, he must satisfy the two-part test pronounced in Strickland by demonstrating that "counsel's performance was deficient," that is, "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687; see also State v. Fritz, 105 N.J. 42, 58 (1987). The first prong requires a showing that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. It is the defendant's burden to prove by a preponderance of the evidence that counsel's decisions about trial strategy were not within the broad spectrum of competent legal representation. See Fritz, 105 N.J. at 52.

Under the "second, and far more difficult[] prong" of the Strickland standard, State v. Gideon, 244 N.J. 538, 550 (2021) (quoting State v. Preciose, 129 N.J. 451, 463 (1992)), a defendant "must show that the deficient

performance prejudiced the defense." State v. O'Neil, 219 N.J. 598, 611 (2014) (quoting Strickland, 466 U.S. at 687). That is, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Gideon, 244 N.J. at 550-51 (alteration in original) (quoting Strickland, 466 U.S. at 694).

Proof of prejudice under Strickland's second prong "is an exacting standard." Id. at 551 (quoting State v. Allegro, 193 N.J. 352, 367 (2008)). A defendant seeking PCR "must affirmatively prove prejudice" to satisfy the second prong of the Strickland standard. Ibid. (quoting Strickland, 466 U.S. at 693). To prevail on a PCR petition, a defendant must establish both prongs of the Strickland test. Strickland, 466 U.S. at 687; State v. Nash, 212 N.J. 518, 542 (2013). A failure to satisfy either prong requires the denial of a PCR petition founded on an ineffective assistance of counsel claim. Strickland, 466 U.S. at 700.

Further, a defendant petitioning for PCR must establish, by a preponderance of the credible evidence, that he is entitled to the requested relief. Nash, 212 N.J. at 541; Preciose, 129 N.J. at 459. To sustain that burden, the defendant must allege and articulate specific facts that "provide the court with

an adequate basis on which to rest its decision." State v. Mitchell, 126 N.J. 565, 579 (1992). Where, as here, a PCR court does not hold an evidentiary hearing, we "conduct a de novo review of both the factual findings and legal conclusions of the PCR court." State v. Blake, 444 N.J. Super. 285, 294 (App. Div. 2016) (quoting State v. Harris, 181 N.J. 391, 421 (2004)).

## III.

In defendant's first point, he maintains his trial counsel was constitutionally ineffective for failing to recall Detective Matthews to testify regarding his interrogation statements about which the State cross-examined him. He contends his credibility was crucial to the case, as he denied the allegations completely, and "the prosecutor painted [him] in an extremely false light" by misconstruing his previous ambiguous statement.

Defendant maintains this "false light could easily have been explained by presenting the testimony of Detective Matthews" and the videotaped statement. He also argues trial counsel's cross-examination of Detective Matthews during the State's case-in-chief did not alleviate the prejudice caused by counsel's failure to recall her, because defendant had not yet testified at that point, and the issue of his videotaped statement did not arise until the State cross-examined him.

As will be discussed, defendant has not included the relevant videotaped statement in the record before us, nor the transcript of that interview, but nevertheless asserts that it "showed [him] demonstrating how his hand, and not his penis, may have brushed [Yvette]'s mouth and face." He argues the video was "critical to [his] ability to meet and counter the suggestions made by the prosecutor" but his counsel did not seek to introduce it despite his urging. We are unpersuaded by these arguments.

The trial court correctly concluded that defendant failed to "affirmatively prove," see Strickland, 466 U.S. at 693, by a preponderance of the evidence the second and "exacting" prong of the Strickland test. Allegro, 193 N.J. at 367. As the court cogently noted, defendant's trial counsel had the opportunity to — and, in fact did — address defendant's statement and his position that it was misconstrued by Detective Matthews on redirect examination. Defendant also made his position clear in his responses to the State's questioning, mentioning multiple times that he was talking about his arm and not his penis.

Second, in assessing whether additional witnesses are sufficient to satisfy Strickland's second prong, "we are guided, in part, by the standard applicable to claims of newly discovered evidence, that is, 'that the evidence "would probably change the jury's verdict if a new trial were granted."'" Gideon, 244 N.J. at 552

19

(quoting Allegro, 193 N.J. at 370). Further, our Supreme Court has expressly "recognize[d] that '[d]etermining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront.'" State v. Pierre, 223 N.J. 560, 579 (2015) (quoting State v. Arthur, 184 N.J. 307, 320 (2005)). Accordingly, our "review of such a decision should be 'highly deferential.'" Arthur, 184 N.J. at 321 (quoting Strickland, 466 U.S. at 689).

Moreover, there is a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. Given that presumption, "complaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy of representation by counsel." Fritz, 105 N.J. at 54 (quoting State v. Williams, 39 N.J. 471, 489 (1963)); see also State v. Echols, 199 N.J. 344, 357-59 (2009).

"The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006) (citing State v. Marshall, 123 N.J. 1, 165 (1991)). Therefore, "[t]o rebut that presumption, a defendant must establish that trial counsel's actions did not equate to 'sound trial strategy.'" State v. Chew,

20

179 N.J. 186, 203 (2004) (quoting <u>Strickland</u>, 466 U.S. at 689). "In evaluating a defendant's claim, the court 'must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of the attorney's conduct.'" <u>Ibid.</u> (quoting <u>Strickland</u>, 466 U.S. at 690).

From that "highly deferential" viewpoint, we are satisfied defendant failed to establish either prong of the <u>Strickland</u> test based on his counsel's failure to recall Detective Matthews during his case-in-chief. Although defendant maintains Detective Matthews' testimony would have "explained" the "false light" in which the prosecutor allegedly conveyed his statement, he does not specify what the detective would have said, or how that testimony would have overcome the other evidence against him, most notably, Yvette's explicit testimony regarding the sexual assault and previous incidents of abuse, as well as Anne's and Claudia's testimony. As the State noted, recalling Detective Matthews would also open the door for the State to examine defendant's interrogation statements in more detail on cross-examination.

With respect to defendant's ineffective assistance claims based on counsel's failure to introduce the videotape in evidence, we note again that defendant failed to include the recording in the record before us, or the transcript of that interrogation. That procedural infirmity is significant as those materials

21

were referenced without record support contrary to our Rules.  See R. 2:6-2(a)(4)(5) and R. 2:6-19(a)(1)(I) (the appendix must contain "other parts of the record . . . as are essential to the proper consideration of the issues, including such parts as the appellant should reasonably assume will be relied upon by respondent in meeting the issues raised.")

Without such record support, we liken defendant's arguments to "bald assertions," insufficient to support any claim his counsel was ineffective under Strickland or that he was prejudiced.  See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).  Finally, as the State points out, the PCR court was fully aware of the contents of the tape, having presided over the suppression hearing and trial.  In addition, it appears defendant presented the taped interrogation to the PCR court who rejected defendant's PCR claims based on it.  Nothing in the record before us supports disturbing the court's findings and legal conclusions on this point.

We would be remiss if we did not note that defendant's counsel's choices reveal the video likely possessed at least some capacity to prejudice defendant.  Specifically, trial counsel moved to suppress the statement pre-trial and at trial, noted she "directed [defendant] not to say anything about his . . . interrogation" and "specifically stayed away from the alleged statement that his penis might

have brushed upon [Yvette's] lips" during defendant's direct examination "specifically so that it could not be crossed on." We simply cannot conclude these clearly strategic choices of counsel to keep defendant's interrogation statements out of the jury's purview were constitutionally deficient or prejudiced defendant. See Castagna, 187 N.J. at 314-15 (noting that "[a]s a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal 'except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial'") (second alteration in original) (quoting State v. Buonadonna, 122 N.J. 22, 42 (1991)); see also Marshall, 123 N.J. at 167 (inferring counsel's "strategic decision to avoid any emotional appeal to the jury" during closing arguments).

IV.

In his second point, defendant contends trial counsel was ineffective for failing to request the jury be "voir dired after the jury stated they were at a stalemate and confused whether they could render a verdict without any physical evidence." Relying upon State v. Middleton, 299 N.J. Super. 22, 30 (App. Div. 1997), he contends the court should have conducted an additional voir dire to "explore the jury's confusion and recharged them with tailored instructions on reasonable doubt, direct and circumstantial evidence, and the credibility of

witnesses." Defendant maintains the court's response "constituted unfair judicial coercion and resulted in the trial court erroneously instructing the jury to simply continue their deliberations." Again, we are unconvinced.

"[A]ppropriate and proper jury charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). "The trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). However, "[n]o party is entitled to have the jury charged in his or her own words," and "all that is necessary is that the charge as a whole be accurate." State v. Jordan, 147 N.J. 409, 422 (1997).

We are satisfied defendant failed to meet either the performance or prejudice prong of the Strickland test on this issue as well. First, the court gave the relevant Model Charge when a jury indicates it is unable to come to a unanimous verdict. See Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations." Defendant does not explain how that instruction constituted "unfair judicial coercion," simply because the court did not also repeat certain other instructions.

Second, as the State aptly notes, the jury foreperson indicated it had "settled" its question after reviewing a written copy of the charge. That charge included the reasonable doubt, direct and circumstantial evidence, and witness credibility instructions defendant now suggests the court should have given. Defendant does not explain how giving those instructions again would have led to a different outcome.

We find defendant's reliance on Middleton for the proposition the court should have conducted a voir dire of the jurors following their question, particularly where neither defendant, the State, nor the court indicated any difficulty understanding the jury's note misplaced. In that case, we reversed a jury verdict entered after the jury asked to see the testimony of the arresting officers regarding the identification of defendant, the only evidence connecting defendant with the drug sales for which he was charged. Middleton, 299 N.J. Super. at 29-30. Although the trial had been "sound recorded," no transcript existed, and the court responded to the jury's question with a one-word answer: "no." Ibid. We explained the court was required to "respond substantively to questions asked by the jury during deliberations and must assure itself that it understands the import of the questions," and held the court had erred by not

inquiring if the jury sought to have the testimony read or played back to it, a request which should ordinarily be granted. Id. at 30-31.

Here, in contrast, the jury's question did not pertain to particular evidence or testimony, but rather asked for guidance on how to proceed. Neither party nor the court indicated any confusion about what the jury was asking. And before us, defendant points to nothing in the jury's question which gave rise to any misunderstanding of what it sought. Unlike the court's single-word response in Middleton, here the court gave the charge specifically tailored for this situation and referred the jury to the previously given charge. That answer was clearly a substantive response to the jury's question as required by Middleton.

V.

Next, defendant summarily argues his appellate counsel was ineffective for failing to raise the jury instruction issue as plain error on direct appeal. We are unpersuaded by this assertion.

As defendant correctly notes, the "right to effective assistance includes the right to the effective assistance of appellate counsel on direct appeal." O'Neil, 219 N.J. at 610; see also State v. Morrison, 215 N.J. Super. 540, 545 (App. Div. 1987) ("[D]ue process guarantees a criminal defendant effective assistance of counsel on a first appeal as of right."). We apply the Strickland

standard to determine an ineffective assistance of appellate counsel claim. Harris, 181 N.J. at 518.

In its assessment of the first prong of the Strickland standard, a court must be mindful that "appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant." Morrison, 215 N.J. Super. at 549 (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)); see also State v. Gaither, 396 N.J. Super. 508, 516 (App. Div. 2007) (holding that appellate counsel is not "required to advance every claim insisted upon by a client on appeal"). In that regard, a criminal defendant's counsel is not ineffective by failing to raise a meritless legal argument in support of an appeal on the defendant's behalf. State v. O'Neal, 190 N.J. 601, 619 (2007); State v. Worlock, 117 N.J. 596, 625 (1990). As the United States Supreme Court noted, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones, 463 U.S. at 751-52. Further, defendant must also establish that he "was prejudiced, i.e., but for counsel's unprofessional errors, the result would have been different.'" Gaither, 396 N.J. Super. at 513 (quoting Morrison, 215 N.J. Super. at 546).

The PCR court correctly concluded that defendant failed to meet either the performance or prejudice prong of the <u>Strickland</u> test as it relates to his appellate counsel's performance. We are satisfied that if any such challenges to the court's instructions were made, they would have failed, as the court committed no error on that issue, let alone plain error. See <u>State v. McKinney</u>, 223 N.J. 475, 494 (2015) (noting plain error pertaining to jury instructions is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result" (quoting <u>State v. Camacho</u>, 218 N.J. 533, 554 (2014)) (alteration in original)). As noted, appellate counsel cannot be faulted for failing to raise a meritless argument nor can he be criticized, even if an error was committed, for a decision that would have no effect on the outcome of the appellate proceeding.

Finally, because defendant failed to establish a prima facie case of ineffective assistance, an evidentiary hearing was not required. See <u>Preciose</u>, 129 N.J. at 462.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1795-22