# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0303-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CARLOS A. GONZALEZ,

     Defendant-Appellant.

_____

> Argued December 3, 2024 – Decided May 14, 2025
>
> Before Judges Susswein and Bergman.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 20-11-0312.
>
> Ethan Kisch, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Ethan Kisch, of counsel and on the briefs).
>
> Khyzar Hussain, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Patrick F. Galdieri II, Assistant Prosecutor, of counsel and on the brief; Khyzar Hussain, on the brief).

PER CURIAM

Defendant Carlos A. Gonzalez appeals his jury trial convictions for first-degree aggravated sexual assault, second-degree sexual assault, and second-degree child endangerment—crimes he committed against his eight-year-old stepdaughter, E.C.[1]  At his first trial, the court granted the State's motion to amend the indictment from a single offense date to a date range that included the date of the final alleged act of sexual abuse.  Defense counsel did not object to the amendment, but instead "submit[ted]."  The first trial ended with a hung jury.  At the retrial before a different judge, defendant was found guilty and sentenced to a thirty-year term of imprisonment on the aggravated sexual assault conviction and a concurrent ten-year prison term on the sexual assault conviction.

Defendant now argues the judge who presided over his first trial unlawfully amended the indictment.  Defendant also argues for the first time that the prosecutor committed misconduct in summation by misrepresenting the evidence and offering an unsupported theory regarding saliva found on the

---

[1]  We use initials to protect the confidentiality of the minor victim.  R. 1:38-3(d).

A-0303-23

victim's undergarments. After reviewing the record in light of the parties' contentions and governing legal principles, we affirm the convictions.

In addition, defendant challenges his sentence, arguing the trial court failed to properly apply the aggravating and mitigating sentencing factors, should have merged the aggravated sexual assault and sexual assault convictions, and committed other errors pertaining to the award of jail credits and the imposition of a monetary penalty. We are unpersuaded that the trial court misapplied the relevant aggravating and mitigating factors. Nor are we persuaded the court erred by imposing separate sentences—to be served concurrently—on the aggravated sexual assault and sexual assault convictions. The State nonetheless acknowledges the trial court miscalculated the jail credits and failed to consider whether defendant was able to pay the monetary penalty. Accordingly, we remand for the limited purpose of correcting those errors.

I.

A.

We summarize the pertinent facts presented at trial. Sometime in 2017 or 2018, J.R. and defendant began dating and later married. J.R. has two children,

3

a daughter, E.C.[2], and a son. In October 2018, J.R., her two children, and defendant moved into an apartment in Jersey City.

Although defendant is not E.C.'s biological father, E.C. called him "daddy" and regarded him as her "parent." Defendant was occasionally responsible for taking E.C. to school, and he took her to run errands, to go grocery shopping, to work, to the park, and other "regular things that a parent takes their kid to do."

E.C. testified about several instances where defendant sexually assaulted her, touched her, and made her touch him. She also testified in detail about the last instance of abuse, which occurred on January 31, 2020. That night, defendant stayed home with E.C. J.R. and her son were not home.

E.C. testified that she was watching television in the living room when defendant called her into his bedroom. He told her to sit on the bed to watch television and lay down. He then put his hand underneath her shirt to touch her breast and touched her "butt" over her clothes. Defendant undressed himself and took off E.C.'s pants. He told her to touch his "private part" with her hand. She testified that defendant put his "private part" into her "private part," which hurt and made her feel uncomfortable.

---

[2] E.C. was born in November 2010.

4

Defendant's version was different. Defendant recalled that he was trying to sleep in his bed when he felt "something that went on top of [his] hip." He alleged that it was E.C. and that he grabbed her hands, yelled at her, pinned her to the bed, and told her, "this was the last time that she was going to do something like that." Defendant claims, "[s]he left the room and that was it."

J.R. returned home while everyone was asleep. The next morning, J.R. noted that E.C. was "acting funny" as if something was "wrong." J.R. told E.C. that she loved her and reminded her that she could tell her anything. E.C. then went to her bedroom and wrote her mother a note. J.R. testified that E.C. came into J.R.'s bedroom, "tossed a paper" at her, and then ran back into her own bedroom and locked the door. E.C. testified that she left a folded note on her mother's bed and locked herself in her room because she was scared but wanted help. E.C.'s note read, in part: "every[]time you[']r[e] not look[ing] DADDY has sex with me."

After reading the note, J.R. went to E.C.'s locked bedroom and E.C. let her in. J.R. asked her, "[d]o you understand what we're talking about today." E.C. responded "yes, I understand." J.R. then asked, "what is sex?" E.C. responded, "when a man puts his private into a girl's private."

A-0303-23

J.R. immediately packed some belongings for herself and her two children and left the apartment. She went to her mother's house in Hoboken where she "feel[s] safe." After discussing the situation with her mother and sister, J.R. took E.C. to Riverside Pediatrics. Dr. Jarrod Kucharski conducted a "head-to-toe" physical exam, including a "very cursory external vaginal exam" because he was not trained in gynecological care. He reported the alleged sexual abuse to the Hoboken Police Department, as required by law.

While at the doctor's office, defendant began calling and texting J.R. She ignored the calls but responded to the text messages. Defendant repeatedly asked J.R. what was going on and where they were. J.R. told him that she was at pediatrician's office with E.C. J.R. texted him, "I never in my life thought that this could happen to me and my daughter[.]" Defendant continued to press J.R. about what had happened and, without any more information, texted, "J.R. this is a tragedy and all of this needs to get resolved[,]" "I'll call the police[.]" He texted that he would turn himself in "for not being an adult and not trying to get her away from me[.]" He added, "J.R. I never did anything by force[,]" "[w]e should have resolved this[,]" "[s]he was doing something bad[,]" "I didn't want to be near her[,]" "[a]nd I didn't tell you because I was scared."

6 A-0303-23

Defendant then denied doing anything to E.C. and instead accused E.C. of inappropriate behavior. He texted "[t]here hasn't been sex[,]" "I didn't rape her or have sex[,]" and "I am not a monster[.]" Defendant also texted, "I'm not a saint either, but I didn't do what you're saying."

That same day, Kendra Hyland, a forensic nurse examiner from the Hudson County Prosecutor's Office Special Victims Unit, interviewed J.R. and E.C. at the Hoboken University Medical Center emergency room. Hyland performed a "head-to-toe exam[,]" including an examination and swabbing of E.C.'s vaginal and anal area. She collected E.C.'s underwear as evidence, which was also swabbed.

Erica Hunger, a forensic scientist with the New Jersey State Police Office of Forensic Sciences, tested the vaginal swabs, anal swabs, external genital swabs and underwear. "[S]perm was not detected" on any of the swabs. She performed an "amylase" test, which is an enzyme that is present in saliva, and found "two positive amylase stains." Due to this positive test result, she sent out a "cutting" of the underwear for DNA matching.

Linnea Schiffer, a forensic scientist also with the New Jersey State Police Office of Forensic Sciences, testified as an expert in forensic DNA testing and analysis. Schiffer tested E.C.'s underwear sample for defendant's DNA, which

A-0303-23

revealed that "there was a lot of D.N.A. from one person and a little bit from another person[.]" Schiffer opined that the DNA was consistent—although not conclusive—with defendant's DNA obtained from a buccal swab.

Shiffer specifically testified about Y-STR analysis, noting that a "Y-STR profile" targets the Y chromosome, which is only found in males. She explained, "this female victim will not have a Y chromosome because she is a female. So we target the Y chromosome . . . to get that Y-STR D.N.A. profile." Shiffer added, "[t]hese D.N.A. profiles don't mean anything on their own. They are only important when they are compared to somebody else so that we could exclude or include a person."

Shiffer developed a Y-STR profile from E.C.'s underwear sample, and then a second Y-STR profile from defendant's buccal swab. She compared the two Y-STR profiles from sixteen different locations on E.C.'s underwear and found that each location failed to exclude defendant as a possible source of the Y-STR DNA. Shiffer then conducted a statistical analysis. Defendant's Y-STR profile was entered in a Y-STR database[3] for comparison. She testified this matching would occur in "no more than one in every [two thousand] males."

---

[3] Shiffer testified that a Y-STR database is a collection of Y profiles in the general population.

A-0303-23

Hudson County Prosecutor's Office Detective Francine Cifuentes testified about her interview of E.C. The jury also heard a recording of the interview following Cifuentes's testimony.

On February 24, 2020, nearly a month after the alleged assault, medical staff at the Audrey Hepburn Children's House at Hackensack University Medical Center, the regional diagnostic center for child abuse and neglect, examined E.C. Dr. Julia Debellas testified that, due to the delay, she was unable to confirm or deny that sexual abuse had occurred because the possible injuries "like fissures, bruises, abrasions, [and] hematomas . . . heal[]quickly [and] . . . efficiently."

## B.

In October 2020, defendant was charged by indictment with first-degree aggravated sexual assault of a victim under thirteen, N.J.S.A. 2C:14-2(a) (count one); second-degree sexual assault of a victim under thirteen by a person four or more years older, N.J.S.A. 2C:14-2(b) (count two); and second-degree endangering the welfare of a child by a person with responsibility for the victim's care, N.J.S.A. 2C:24-4(a) (count three). The indictment alleged that defendant "did commit an act of sexual penetration upon his step-daughter, E.C." "on or about the [second] day of November, 2018[.]" At the grand jury presentation, however, the jury heard testimony that defendant sexually

9

assaulted E.C. "on multiple dates[,]" and "it started happening a few months after initially moving to Jersey City," "[b]ut the last incident had happened on January 31[] . . . [,] 2020[.]"

Defendant was tried before a jury over the course of seven nonconsecutive days from October 18 to November 1, 2022. On the second day of trial, the State moved to amend the indictment to reflect the "date range" of defendant's alleged misconduct, specifically to refer to "[a] period of time beginning on that November 2[], 2018 date and continuing until the subject matter the jurors heard at this [first] trial, January 31[], 2020 or February 1[], 2020[.]" The trial court granted the State's application after defense counsel "submit[ted.]"

At the conclusion of the first trial, the jury was deadlocked, resulting in a mistrial. Five months later, from March 7 to March 10, 2023, defendant was retried before another judge and a jury. After the State rested, defendant moved for a judgment of acquittal, which the trial court denied. After defendant presented his defense, the jury returned a guilty verdict on all three counts.

A sentencing hearing was convened on July 21, 2023. The trial court merged the endangering the welfare of a child conviction with the aggravated assault conviction. The court sentenced defendant on the first-degree aggravated sexual assault conviction to a thirty-year term of imprisonment

subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, Megan's Law

registration, and parole supervision for life.  On the second-degree sexual assault

conviction, the court imposed a concurrent ten-year term of imprisonment.

This appeal followed.  Defendant raises the following contentions for our

consideration:

> POINT I
>
> REVERSAL IS REQUIRED BECAUSE THE TRIAL
> COURT VIOLATED [DEFENDANT]'S RIGHT TO
> GRAND JURY PRESENTMENT WHEN IT
> SUBSTANTIVELY AMENDED THE INDICTMENT
> WITHOUT PRESENTING THE NEW CHARGES TO
> A GRAND JURY. N.J. CONST. ART. I, ¶¶ 8 & 10.
>
> POINT II
>
> REVERSAL IS REQUIRED BECAUSE THE
> STATE'S SUMMATION VENTURED FAR
> BEYOND THE TRIAL PROOFS BY
> MISREPRESENTING A KEY PIECE OF FORENSIC
> EVIDENCE AND THEN OFFERING AN
> UNSUPPORTED THEORY ABOUT ITS SOURCE.
> U.S. CONST. AMENDS. VI & XIV; N.J. CONST.
> ART. I, ¶¶ 1, 9, 10.
>
> POINT III
>
> EVEN IF [DEFENDANT]'S CONVICTIONS ARE
> NOT REVERSED, THE MATTER SHOULD BE
> REMANDED FOR RESENTENCING.
>
>> A. The Sentencing Court Did Not (1) Provide a
>> Factual Basis for Aggravating Factors Three and
>> Nine; (2) Assign Any Specific Weight to the

Aggravating Factors; or (3) Undertake a Balancing of the Aggravating and Mitigating Factors.

B. The Court Did Not Supply a Statement of Reasons When the Court Imposed a $2,000 [Sex Crime Victim Treatment Fund] Penalty.

C. The Sentencing Court Did Not Merge Counts One and Two.

D. [Defendant] is Entitled to [Eighteen] Additional Days of Jail Credit.

In his reply-brief, defendant argues:

POINT I

[DEFENDANT] DID NOT INVITE THE TRIAL COURT'S SUBSTANTIVE AMENDMENT TO THE INDICTMENT.

II.

We first address defendant's contention that the judge who presided over the first trial erred by granting the State's motion to amend the indictment. Defendant argues for the first time on appeal that this amendment essentially charged him with additional offenses not heard by the grand jury, thus violating Article I, paragraph 8 of the New Jersey Constitution. He contends the amendment was consequential and went to the "essence" of the offense and, therefore, the State was obliged to go back to the grand jury and seek a

12

superseding indictment. Relatedly, defendant argues that N.J.R.E. 404(b) barred references at trial about sexual abuse committed on any day other than January 31, 2020—the date specified in the original indictment—as prejudicial "other crimes" evidence.

## A.

Defendant's position on the indictment amendment has changed since his conviction. During the colloquy that occurred when the State moved to amend the indictment, the trial court noted,

> preliminarily, I guess the discovery reflects incidents that happened up until that January 31[] date. The video itself is time-stamped. And I'm—obviously, I have not heard the grand jury transcripts, recordings, but as [the State] has proffered, there was testimony during the grand jury to that effect. So my gut, and I'm not making a ruling now, is that your client was put on notice of these . . . allegations.

Defense counsel responded, "I agree with the [c]ourt 100 [percent], if the only issue that appears based on the reading of the rule is notice, then we have notice, that's not an issue. If there's another issue with regard to that, other than notice that's what I need to check." Defense counsel questioned whether the revision was merely "clerical" in nature and asked the court for "some time to check that out." The court reserved its decision to allow counsel an opportunity to research the issue.

A-0303-23

The following morning, the trial court allowed the parties to present additional arguments. The State reiterated that the date range was supported by evidence presented to the grand jury, in the affidavit of probable cause in the original complaint, and in discovery.

Defense counsel replied:

> Judge, I did have a chance also to review the grand jury presentation. That time frame was what was presented to the grand jury. We cannot deny that we were not put on notice of that time frame, especially since that time frame with those dates is specifically referenced and played out by the activities that took place in this case. So based on that and the applicable law we would submit.

Relying in part on State v. Stefanelli, 78 N.J. 418, 429 (1979) (holding that changing or correcting the date is not objectionable when it is not crucial to the defense), the trial court ruled, "I don't find that the time is crucial to a defense in this particular matter. So, I'm going to grant the State's application to amend the indictment to reflect those time changes."

B.

Article I, paragraph 8 of the New Jersey Constitution provides that "[n]o person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury . . . ." An indictment is the method by which the State informs the accused of the crime charged, which must be delivered

14

"intelligib[ly]" and "in reasonably understandable language."  State v. Wein, 80 N.J. 491, 497 (1979).  Stated another way, "[a]n indictment must adequately identify and explain the criminal offense to enable the accused to prepare a defense."  Ibid.  Our Supreme Court more recently reaffirmed that the constitutional right is satisfied when:

> [T]he indictment "inform[s] the defendant of the offense charged against him, so that he may adequately prepare his defense," State v. LeFurge, 101 N.J. 404, 415 [] (1986) (quoting State v. Lefante, 12 N.J. 505, 509 [] (1953)), and is "sufficiently specific" both "to enable the defendant to avoid a subsequent prosecution for the same offense" and "'to preclude the substitution by a trial jury of an offense which the grand jury did not in fact consider or charge,'" ibid. (quoting State v. Boratto, 80 N.J. 506, 519 [] (1979)).
>
> [State v. Dorn, 233 N.J. 81, 93 (2018).]

In State v. Grothmann, the Court held "[i]t is fundamental in the constitutional limitation that an indictment is not amendable by the court to charge an offense not found by the grand jury, either by a substitution of offenses or to supply substantive omissions."  13 N.J. 90, 95 (1953).  However, Rule 3:7-4 provides that an indictment can be amended in limited circumstances:

> The court may amend the indictment or accusation to correct an error in form or the description of the crime intended to be charged or to charge a lesser included offense provided that the amendment does not charge another or different offense from that alleged and the

> defendant will not be prejudiced thereby in [their] defense on the merits.  Such amendment may be made on such terms as to postponing the trial, to be had before the same or another jury, as the interest of justice requires.

Put differently, "[a]n indictment is amendable in form but not in substance."  Grothman, 13 N.J. at 94.  "[O]ne test to determine whether the change made was material is whether judgment of conviction or acquittal on the indictment as drawn would be a bar to a new indictment drawn in the form in which it stood after the amendment."  Id. at 97 (quotation marks omitted) (quoting Commonwealth v. Snow, 169 N.E. 542, 546 (Mass. 1930)).

The Supreme Court has addressed numerous circumstances where amending an indictment was deemed to be appropriate.  See, e.g., State v. Pennington, 119 N.J. 547, 595 (1990) (finding that the amendment was one of form and that it did not unduly prejudice the defendant because it did not change his defense strategy); State v. Orlando, 269 N.J. Super. 116, 139 (App. Div. 1993) (allowing amendment to change the charged offense to one that included a firearm when the indictment clearly referred to a "shotgun"); State v. Lopez, 276 N.J. Super. 296, 307 (App. Div. 1994) (allowing amendment of the indictment "to add the pistol and knife to the description of the deadly weapon").

In State v. J.S., we held it was permissible to amend an indictment charging sexual assault to replace the "breast and inner thigh" with "the vagina." 222 N.J. Super. 247, 257-58 (App. Div. 1988). We reasoned that the specifics "of the particular intimate parts touched is not an essential element of the crime," and that the defendant was not "taken by surprise" by the change. Ibid.

We are unpersuaded by defendant's reliance on cases where indictment amendments were held to be impermissible because they corrected "error[s] relating to the substance or 'essence' of an offense . . . ." See Dorn, 233 N.J. at 94-98 (holding that amending the indictment to increase the offense from third-degree to second-degree charge was substantive and a violation of the defendant's right to grand jury presentment); State v. Catlow, 206 N.J. Super. 186, 195 (App. Div. 1985) (holding that "the degree of a crime [is] an essential element of the grand jury function"). Here, the amendment did not increase the degree of the crime charged.

Nor are we persuaded by defendant's new assertion that amending the indictment from a single offense date to a fifteen-month date range unduly prejudiced his defense. As we have noted, defendant's counsel conceded at the time of the amendment that he knew about the evidence presented to the grand jury concerning multiple instances of sexual abuse.

A-0303-23

These circumstances are distinguishable from the situation in Grothmann. In that case, the defendant was indicted on two separate sexual child abuse incidents involving two different children. 13 N.J. at 93-94. The State sought to amend the indictment at the end of the trial from two single dates to a broader range of dates. See id. at 94-95.

Noting that "[t]he accused cannot be tried for 'two crimes under the charge of one,'" id. at 97, the Grothmann Court concluded that the defendant was not charged with continuous offenses and stressed that the additional offenses were not presented to the grand jury. Id. at 98. The Court concluded that "the amendment brought within the ambit of the indictment other offenses obviously not within the contemplation of the grand jury when the indictment was returned[,]" constituting a denial of the defendant's constitutional guaranty. Ibid. It acknowledged, however, that "[w]here not of the essence of the offense, the specification of time in an indictment is amendable, unless that course would prejudice the substantial rights of the accused, but never to 'charge another or different offense' than that alleged." Id. at 97-98 (emphasis added).

Here, as defense counsel acknowledged during oral arguments on the proposed indictment amendment, the grand jury was presented with evidence of multiple sexual assaults committed over time. At the grand jury proceeding,

Cifuentes testified that E.C. "reported having sex with her stepfather," "that he penetrated her vagina with his penis multiple times[,]" "on multiple dates[,]" "but the last incident had happened on January 31[] of 2020[.]" She further certified that E.C. indicated that "it started happening a few months after initially moving to Jersey City, that he touched her vagina," and that "it [] happened on more than one occasion[.]" Cifuentes explained that E.C. reported that defendant "put his penis, what she called her [sic] private part, inside of her vagina," "he squeezed her breasts, which she identified as her chest, on the skin with his bare hands," and that "he put his penis in her vagina more than one time, and that that day [January 31, 2020] she decided to finally tell her mother[.]" Cifuentes read E.C.'s note to the grand jury, which included language such as "I've been holding this in for quite some time[,]" and "every time you're not look, [sic] daddy has sex with me."

We find further guidance in State v. Middleton, 299 N.J. Super. 22 (App. Div. 1997). In Middleton, we acknowledged the "State is ordinarily given leave to amend the date alleged in the indictment where the date is neither of the essence of the offense nor crucial either to the State's case or the defendant's, and defendant is not, therefore, prejudiced." Id. at 34. We emphasized that when the date is critical to the defense, an amendment to the indictment

changing the date would violate "[b]oth the letter and the spirit of the rule." Id. at 33-34. "It is fundamental that a defendant may not be deprived of a defense or the opportunity to prepare and present one by reason of the State's late amendment of the indictment." Id. at 34. In Middleton, the date was critical to the defense because an alibi was asserted. Here, in contrast, defendant does not assert an alibi defense.

We add that the indictment was not amended to include additional counts that exposed defendant to additional punishment. Importantly, moreover, in the matter before us, defense counsel did not oppose the amendment before the trial court. After being given an opportunity to conduct research and present legal argument, defense counsel "submit[ted]." Defense counsel explicitly acknowledged, moreover, that the time frame of the proposed amendment "was what was presented to the grand jury. We cannot deny that we were not put on notice of that time frame, especially since that time frame with those dates is specifically referenced and played out by the activities that took place in this case."

We also add that the State would have had ample opportunity to seek a superseding indictment following the mistrial but had no occasion to do so based on the defendant's acquiescence to the amendment. In these circumstances,

counsel's acquiescence suggests that any error in amending the indictment was invited. Under the doctrine of invited error, "trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal. . . .'" State v. A.R., 213 N.J. 542, 561 (2013) (emphasis added) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). This doctrine "operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)).

In State v. Jenkins, our Supreme Court has made clear that more is required; in particular, "[s]ome measure of reliance by the court is necessary for the invited-error doctrine to come into play." 178 N.J. 347, 359 (2004). "Conversely, when there is no evidence that the court in any way relied on a defendant's position, it cannot be said that a defendant has manipulated the system" and the invited error doctrine does not apply. Ibid. In that regard, a defendant is particularly prohibited from appealing a trial court decision "where the parties appear to be in agreement on a difficult question of law, the trial court's reliance on the erroneous contentions of counsel is understandable, and

it would be unfair to both the trial court and to the appellant's adversary to reverse." Brett, 144 N.J. at 503.

Here, it appears the first trial court relied on defense counsel "submit[ting]" to the amendment. But even if we reject the State's argument that defendant invited the amendment, defendant on appeal has not established a basis upon which to reverse his convictions. Tellingly, defendant asks us to find that the trial court committed plain error by amending the indictment, signaling his argument on appeal was not raised below. Under the plain error standard,

> an appellate court should disregard errors unless they are "clearly capable of producing an unjust result." [R. 2:10-2]. "This is a 'high bar,' requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 [] (2020) (first quoting State v. Santamaria, 236 N.J. 390, 404 [] (2019); then quoting State v. Macon, 57 N.J. 325, 336 [] (1971)).
>
> [State v. Garcia, 245 N.J. 412, 437 (2021).]

Having acknowledged to the first trial court that the amendment did not prejudice him, we are satisfied defendant has not met this threshold on appeal.

C.

We are also unpersuaded by defendant's corollary argument that he was prejudiced when the "other assaults" that occurred "outside the scope of the

grand jury's original single-day, single assault indictment aimed at January 31, 2020" were admitted at trial. Defendant contends this evidence was admitted in violation of N.J.R.E. 404(b). N.J.R.E. 404(b)[4] does not apply in these circumstances, however, because the State at trial did not present evidence of other bad acts, that is, acts that were not charged in the indictment as amended. Cf. State v. Cofield, 127 N.J. 328, 338 (1992). Rather, the "other" sexual assaults defendant now alludes to were presented to the grand jury and made part of the changes in the amended indictment. Stated another way, the evidence of multiple sexual assaults presented at trial would have constituted "other crimes" evidence for purposes of analysis under N.J.R.E. 404(b) and Cofield only if the indictment had not been amended. Because we deem the amendment

---

[4] Rule 404(b) provides:

> Other Crimes, Wrongs, or Acts. —·
>
> (1) Prohibited Uses. Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.
>
> (2) Permitted Uses. This evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

to be lawful, especially considering defendant's acquiescence at the trial court level, defendant's newly minted N.J.R.E. 404(b) argument is unavailing.

### III.

We turn next to defendant's contention, again raised for the first time on appeal, that he was denied a fair trial because the prosecutor made improper comments during summation.  Defendant argues that "the State invented its own inaccurate version of the forensic evidence when it took the presence of amylase . . . and turned it into forensic proof that 'male saliva' was found on E.C.'s underwear" and then "offered an unsupported theory about how 'the defendant's saliva' ended up on E.C.'s underwear."  We disagree and conclude the prosecutor's remarks were based on legitimate inferences deduced from the evidence and were made in response to defense counsel's own speculative explanation as to how saliva may have been transferred to E.C.'s underwear.

While a prosecutor may "strike hard blows, [they are] not at liberty to strike foul ones."  State v. Farrell, 61 N.J. 99, 104-05 (1972) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).  Even so, a conviction will be reversed based on prosecutorial misconduct only if "the conduct was so egregious as to deprive defendant of a fair trial."  State v. Wakefield, 190 N.J. 397, 437-38 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)).  This means that

the prosecutor's conduct must have been "clearly and unmistakenly improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of [their] defense." Id. at 438. Even when a prosecutor's comments "could be termed questionable," a new trial is not warranted unless the comments are "sufficiently severe" to show a clear potential for prejudice. Id. at 440. Thus, "[n]ot every instance of misconduct in a prosecutor's summation will require a reversal of a conviction. There must be a palpable impact." State v. Roach, 146 N.J. 208, 219 (1996).

That standard presupposes, of course, that the prosecutor made improper comments. In closing arguments, prosecutors are "expected to make vigorous and forceful . . . arguments to juries" and "are afforded considerable leeway . . . as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). A prosecutor "is entitled to be forceful and graphic in [their] summation to the jury, so long as [they] confine[] [themselves] to fair comments on the evidence presented." State v. Timmendequas, 161 N.J. 515, 587 (1999) (quoting State v. DiPaglia, 64 N.J. 288, 305 (1974) (Clifford, R., dissenting)). Furthermore, a reviewing court evaluates challenged remarks not in isolation but in the context of "the summation as a whole," State v. Atwater, 400 N.J. Super. 319, 335 (App. Div.

25

A-0303-23

2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)), and "in the context of the entire record," State v. Bey, 129 N.J. 557, 622 (1992).

Still, a prosecutor's summation "must be limited to the facts in evidence and inferences reasonably to be drawn therefrom." Ibid. While counsel is to be given broad latitude in summation, they may not misstate the evidence or distort the factual picture. Geler v. Akawie, 358 N.J. Super. 437, 467 (App. Div. 2003). Counsel is, however, permitted to argue from the evidence any conclusion that the factfinder is free to reach. Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999). "Indeed, counsel may draw conclusions even if the inferences that the jury is asked to make are improbable, perhaps illogical, erroneous or even absurd, unless they are couched in language transcending the bounds of legitimate argument, or there are no grounds for them in the evidence." Ibid. In addition, prosecutors are permitted to respond to arguments raised by defense counsel as long as they do not stray beyond the evidence. State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001) (finding that "the State's invited response" did not unfairly prejudice defendant when it "did no more than balance the scales").

Turning to the matter before us, defendant argues that the prosecutor improperly characterized "amylase" as "male saliva" and inappropriately

theorized as to how that amylase may have been transferred to E.C.'s underwear. Specifically, he challenges the following underlined portions of the prosecutor's summation:

> When you look at evidence follow the logical inference that could be drawn from that piece of evidence, follow what your commonsense tells you that evidence demonstrates to you. And speaking of reasonable inferences, I submit to you a reasonable inference that could be made from the evidence of this case, as [defense counsel] stated in his closing arguments, there's no allegations of oral sex or anything along those lines. So you may have the question nagging in the back of your head, why is there male saliva on [E.C.'s] underwear.
>
> I am sorry to be graphic to all of us, but we are all adults in this room and what nine year old [E.C.] probably doesn't understand, what we can all understand as adults through our collective life experiences to this point, is sometimes people use saliva as a lubricant during sexual acts. I submit to you that is exactly what happened here today.
>
> [E.C.] lay on the bed as the defendant pulled down her pants and pulled down his pants. The defendant inserted his penis, into [E.C.'s] vagina. Then when the act was finally over, when [E.C.] pulled up her pants to go back to the living room to go back to that room, [defendant]'s saliva, still on her genital area ended up exactly on her underwear where you would expect it to in the situation.
>
> [(Emphasis added).]

Defendant contends for the first time on appeal the underscored comments

left the jury "with the State's inaccurate version of the evidence[.]" The State counters the prosecutor's remarks were a fair response to the explanation defense counsel posed in his summation on how the saliva appeared on E.C.'s underwear. Defense counsel argued in closing:

> Let's start with what they'll consider the supporting evidence. So you got to hear about DNA. DNA is kind of a cool thing. If you're not really familiar with it, it's kind of an interesting thing. We have all of these things in our body and it kind of freaks me out a little bit.
>
> But what does that actually mean? Does that support the State's case? <u>One main thing from the get go, is there was never any allegation of oral sex, none</u>. <u>So what does the presence of the [a]mylase or evidence called which comes from saliva being on her underwear mean</u>? <u>Well nothing</u>. They're not alleging that there was oral sex that took place. If there was maybe that would be different. Maybe that would be a significant factor. But they're not.
>
> So you got to hear from the DNA expert who told you what, people live together. Saliva can come from anywhere. <u>It could be you touched your mouth, you touched something, somebody else comes and touch it and now your saliva is on their hand</u>. <u>It's just transfer, that's what it is called for DNA purposes</u>. It's transfer. So, it doesn't mean anything that is there in the first place. And it doesn't mean anything even more in the context of facts in this case. So does DNA support the State's position? No.
>
> [(Emphasis added).]

Considering the complete record and defense counsel's summation, we are

28

satisfied the prosecutor's closing remarks were not improper. The State presented forensic evidence that E.C.'s underwear tested positive for two amylase stains, which is an enzyme present in all sexes' saliva. It presented additional forensic evidence that the Y-STR profile present in the amylase on E.C.'s underwear matched defendant's "Y-STR profile," which would only occur in no more than one out of two thousand males. This evidence supports the State's theory that the saliva had been produced by a male. The prosecutor was permitted to infer how the male saliva, which was consistent with defendant's "Y-STR" profile, may have reached a nine-year-old girl's underwear.

Furthermore, defense counsel opened the door to the prosecutor's theory by asking the jury to consider "what does the presence of the [a]mylase or evidence called which comes from saliva being on her underwear mean? Well nothing." The prosecutor was permitted to offer a different conclusion as to the import of the evidence. See Munoz, 340 N.J. Super. at 216; see also State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011) (explaining that a prosecutor's statements that would otherwise be improper "may be deemed harmless if made in response to defense arguments").

Finally, we note defense counsel did not challenge the prosecutor's statements when they were made and therefore, suggesting that counsel did not

believe they were prejudicial. See Timmendequas, 161 N.J. at 575; see also Frost, 158 N.J. at 84 (stating that "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made").

IV.

We next address defendant's sentencing arguments. He contends the trial court failed: (1) to properly apply and provide a factual basis when it applied the aggravating and mitigating factors; (2) to merge convictions under counts one and two; (3) to explain its reasons for imposing a $2,000 penalty to the Sex Crime Victim Treatment Fund (SCVTF); and (4) to account for all of defendant's jail credits.

"Appellate courts review sentencing determinations in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). The reviewing court must not substitute its judgment for that of the sentencing court. State v. O'Donnell, 117 N.J. 210, 215 (1989). Accordingly, the sentence must be affirmed unless:

> (1) [T]he sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the

A-0303-23

sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Stated another way, we may modify a defendant's sentence only when convinced that the sentencing judge was clearly mistaken. State v. Jabbour, 118 N.J. 1, 6 (1990).

The aggravating and mitigating factors that a trial court must consider in imposing a sentence are set forth in N.J.S.A. 2C:44-1(a) and (b). It is well-established that the consideration of aggravating and mitigating factors must be part of the deliberative process. State v. Dalziel, 182 N.J. 494, 505 (2005); State v. Cassady, 198 N.J. 165, 180 (2009). As our Supreme Court recently stressed, trial courts must "explain and make a thorough record of their findings to ensure fairness and facilitate review." State v. Comer, 249 N.J. 359, 404 (2022). "Proper sentencing thus requires an explicit and full statement of aggravating and mitigating factors and how they are weighed and balanced." State v. McFarlane, 224 N.J. 458, 466 (2016) (quoting State v. Randolph, 210 N.J. 330, 348 (2012)). See also State v. Case, 220 N.J. 49, 66 (2014) ("[C]ritical to the sentencing process and appellate review is the need for the sentencing court to explain clearly why an aggravating or mitigating factor presented by the parties

was found or rejected and how the factors were balanced to arrive at the sentence."). When the trial court fails to provide a qualitative analysis of the relevant sentencing factors on the record, an appellate court may remand for resentencing. State v. Kruse, 105 N.J. 354, 363 (1987).

Defense counsel sought imposition of the minimum sentence of twenty-five years, arguing that defendant "will be deported on completion of his sentence" and that "the interest of justice would not require that he wait [thirty] years, or [thirty-five] years, or [forty] years before he is deported." The trial court instead sentenced defendant to a term of thirty years for first-degree aggravated sexual assault with a victim less than thirteen years of age, and ten years for second-degree sexual assault with a victim less than thirteen years of age to run concurrently.

The trial found aggravating factors two ("the gravity and seriousness of harm inflicted on the victim," N.J.S.A. 2C:44-1(a)(2)), three ("the risk that the defendant will commit another offense[,]" N.J.S.A. 2C:44-1(a)(3)), and nine ("the need for deterring the defendant and others from violating the law[,]" N.J.S.A. 2C:44-1(a)(9)) all applied. The court also found mitigating factor seven ("the defendant has no history of prior delinquency or criminal activity[,]" N.J.S.A. 2C:44-1(b)(7)) applied.

While noting that defendant was forty years old with no criminal record, the trial court found the aggravating factors outweighed the mitigating factor. We see no abuse of discretion. Although the court did not expressly state the weight it placed on the mitigating factor, we note that when defense counsel argued that mitigating factor seven applied. He acknowledged that "[i]ts tough to argue mitigating factors for a person who maintains his innocence because we don't present any explanation for how the situation could arise and how it could be avoided." In these circumstances, we see no point in requiring the trial court on remand to assign weight to the mitigating factor in relation to the three aggravating factors. Cf. State v. Kruse, 105 N.J. 354, 363 (1987).

Nor are we persuaded the trial court erred in imposing separate, concurrent sentences on defendant's convictions for aggravated sexual assault under N.J.S.A. 2C:14-2(a) and sexual assault under N.J.S.A. 2C:14-2(b). The doctrine of merger prevents a defendant from being punished more than once for a single wrongdoing. N.J.S.A. 2C:1-8(a)(1). It is "based on the concept that 'an accused [who] committed only one offense . . . cannot be punished as if for two.'" State v. Tate, 216 N.J. 300, 302 (2013) (quoting State v. Davis, 68 N.J. 69, 77 (1975)).

When considering merger of convictions, a court first determines whether the Legislature intended to create separate offenses to determine whether a

A-0303-23

defendant may be punished for two convictions. Davis, 68 N.J. at 77-78. If it did, then the court must decide whether the offenses are so similar that conviction for both is nonetheless prohibited by the Constitution. Id. at 81. The court should consider the elements of the crime and the facts of the case "attended by considerations of 'fairness and fulfillment of reasonable expectations. . . .'" Ibid. (quoting State v. Currie, 41 N.J. 531, 539 (1964)). The court must also consider "the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed." Tate, 216 N.J. at 81 (quoting Davis, 68 N.J. at 81). The weight that any factor receives "depend[s] on the circumstances of the particular case." Davis, 68 N.J. at 81.

Further, when the facts "clearly indicate conduct constituting violations of different criminal statutes," merger is generally inappropriate. State v. Adams, 227 N.J. Super. 51, 61 (App. Div. 1988). In this instance, the aggravated sexual assault charge required "sexual penetration" while the sexual assault charge required a different type of "intentional touching" and an additional element of a specific age gap. Defendant acknowledges, "the statutes have

34

obvious differences[.]" In these circumstances, merger was not required and we decline to reach a different conclusion than the trial court.

We nonetheless agree with defendant's remaining sentencing arguments concerning the SCVTF penalty and the award of jail credits. The State concedes a remand is needed to correct the judgment of conviction (JOC) with respect to jail credits and to have the court clarify the reasons for imposing the $2,000 penalty and to consider the defendant's ability to pay it.[5] See State v. Bolvito, 217 N.J. 221, 233 (2014).

To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

---

[5] The State in its appeal brief acknowledges:

> [T]he matter should be remanded to the sentencing court for the limited purpose of correcting his JOC to accurately reflect defendant's sentence; to recalculate the jail credits he may be entitled to; and, to allow the sentencing court to consider defendant's ability to pay and to provide a statement of reasons to support the imposition of the SCVTF penalty.

A-0303-23